IN THE UNITED STATED DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No.:

| | | |
|---|---|---|
| CASIM NOBLE,<br>Plaintiff,<br>vs. | )<br>)<br>)<br>) | |
| | ) | **COMPLAINT** |
| TOSHIBA GLOBAL | ) | *Jury Trial Demanded* |
| COMMERCE SOLUTIONS, Inc.; | ) | |
| Steven Mensch, James Fornabaio, | ) | 24cv 1084 |
| Michael Glendenning, | ) | |
| Scott Enke, Patrick Tarry, | ) | |
| Amanda Stevens, Bob Hunsinger, | ) | |
| Defendants | ) | |

FILED IN THIS OFFICE DEC 1 9 2024 Clerk U.S. District Court Greensboro, NC BY

NATURE OF THE ACTION

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and to

provide appropriate relief to CASIM NOBLE ("Plaintiff"), who was adversely affected by

Defendant's unlawful employment practices. As alleged with greater particularity below,

Plaintiff alleges that TOSHIBA GLOBAL COMMERCE SOLUTIONS, Inc. through the conduct

of it's officers Steven Mensch, Michael Glendening, Bob Hunsinger, HR Rep Patrick Tarry,

James Fornabaio and Amanda Stevens ("Defendants") formed a tacit agreement the object of

which was to conspire to form a "Continuing Civil Conspiracy" to discriminate against Plaintiff

on the basis of his race via unlawful employment practices including, but not limited to, fraud

and defamation and to retaliate against Plaintiff for the exercise of his protected rights and/or

opposing race discrimination in the workplace and to obstruct the investigation of a federal

agency by means of fraud, suppression of evidence and cover up and acted overtly in the

furtherance thereof. COMPLAINT FOR EMPLOYMENT DISCRIMINATION.

1

<u>JURISDICTION AND VENUE</u>

1. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1337, 1343 and 1367.

2. This action is authorized and instituted pursuant to: Sections 706(f)(1) and (3) of Title VII, 42 U.S.C. § 2000e et seq, and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981.

3. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Middle District of North Carolina.

4. <u>PARTIES</u>

5. Plaintiff Casim Noble is a natural person and citizen of the United States, domiciled in the State of North Carolina and the City of Durham. At all relevant times, Plaintiff was black American. Address: 3116 Genlee Drive, Durham, North Carolina 27704; Telephone: 919-454-6935; Email: cnoble1222@yahoo.com

6. At all relevant times, Plaintiff was an employee of TOSHIBA GLOBAL COMMERCE, Inc. Address: 2506 South Tri-Center Boulevard, Durham, North Carolina 27713 As defined in Section 701 (f) of Title VII.

7. At all relevant times, Defendant, a North Carolina corporation, has continuously been an employer engaged in an industry affecting commerce under Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h).

8. Defendant Steven Mensch, Senior Vice President, World Wide Operations, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

2

9. Defendant James Fornabaio, Senior Vice President, Human Resources, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

10. Defendant Scott Enke, Director, World Wide Operations, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

11. Defendant Michael Glendenning, Senior Manager, World Wide Operations, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

12. Defendant Bob Hunsinger, Manager, World Wide Operations, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

13. Defendant Amanda Stevens, Senior Manager, Human Resources, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

14. Defendant Patrick Tarry, Senior HR Business Partner, Human Resources, Toshiba Global Commerce Solutions. Address: 3901 South Miami Boulevard, North Carolina 27703.

## 15. ADMINISTRATIVE PROCEDURES

16. On or about September 11, 2023 and more than thirty (30) days prior to the institution of this lawsuit, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII by TOSHIBA GLOBAL COMMERCE SOLUTIONS, Inc. Case 1:18-cv-01046-WO-JLW Document 4 Filed 03/22/19 Page 2 of 14 3

17. On or about January 9, 2024 Plaintiff filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") alleging "Continuing

3

Civil Conspiracy" violations of Title VII by TOSHIBA GLOBAL COMMERCE SOLUTIONS, Inc. Both Complaints were consolidated.

18. The Complaint was Amended in March of 2024 on the basis of Defendants subsequent Continuing Civil Conspiracy to discriminate and retaliate against Plaintiff.

19. The Complaint was Amended a second time in April 2024 based on Defendants subsequent Continuing Civil Conspiracy to discriminate and retaliate against Plaintiff.

20. The Complaint was Amended a third and final time in June 2024 based on Defendants subsequent Continuing Civil Conspiracy to discriminate and retaliate against Plaintiff.

21. On September 20, 2024 the EEOC granted Plaintiff Right To Sue in Federal District Court within 90 days of September 20, 2024.

22. The above-given filing date, 20 December 2024 was within one hundred eighty (180) days of the most recent act in the Continuing Civil Conspiracy giving rise to this action.

23. The basis of the aforementioned charge was race discrimination, retaliation, fraud, defamation and obstruction.

24. All conditions precedent to the institution of this lawsuit have been fulfilled.

## 25. BACKGROUND

26. In 2021 Plaintiff's Manager Plaintiff Manager Michael Glendenning, without cause or justification, and without knowledge or consent of Plaintiff, Plaintiff Manager Michael Glendenning stripped Plaintiff of his role of Toshiba Global Commerce Solutions Tri-

4

Center Facility Management which Plaintiff had applied for and was hired for, *Lead Teams* in execution, *Lead* new support program implementation, *assign resources*, adjust processes to meet Customer targets and deadlines which included both Leadership and delegation/assignment authority of personnel without, asking me, consulting with me or affording me the opportunity to accept or reject and instead reassigning me to a role and Title I never asked for or applied to. This constituted an adverse change in the terms, conditions, roles and responsibilities of Plaintiff employment.

27. The sole purpose of this act was to alter the terms, conditions, role, scope and responsibilities of Plaintiff in an adverse way.

28. The adverse nature of Plaintiff Manager Michael Glendenning's actions was to **a)** strip away Plaintiff's formal Leadership role within the operational structure **b)** alter Plaintiff's direct function and scope relating to Tri-Center Facility operations **c)** the authority to drive best practices **d)** meaningfully alter the authority and organizational track of Plaintiff's role within the organizational structure **e)** fraudulently concea the fact that Plaintiff was the one who conceived the "idea", "concept", "design", "methodology" and "implementation" of the Cost, Quality and Performance Metrics and KPIs and thus has always been an integral factor in driving the performance results of the business model. The loss of these key elements decreased Plaintiff's role in meaningful ways.

29. Plaintiff's Manager Plaintiff Manager Michael Glendenning never met and discussed his intention to change Plaintiff's job that Plaintiff applied for and was hired for.

30. Nor was Plaintiff offered a choice in the matter. Plaintiff was not informed by his Manager Plaintiff Manager Michael Glendenning until after the fact.

31. Nor was Plaintiff made aware of or allowed to see his new job description until over a year after his Manager Plaintiff Manager Michael Glendenning had made the change.

32. Although Plaintiff was told the change was a Promotion because there was a salary increase, he was not made aware that the overall substance of his role had been drastically diminished. The fact that the job description itself was not discussed or revealed to him until a year later and even then only at his persistent urging and insistence was deceptive and disparate in and of itself.

33. This was both disparate and discriminatory in that Plaintiff's Manager Plaintiff Manager Michael Glendenning never did this to a white employee. To the contrary, he always allowed them to voluntarily apply for other roles on their own and always afforded them the courtesy and consideration of discussing the nature and scope of the job with them before allowing them to make a decision.

34. In stark contrast, Plaintiff's job change was the result of a preemptive action taken by his Manager without forewarning or consideration and the actual job description was not revealed to him until over a year later.

35. In fact, Plaintiff contends that, in role and scope, the change was marginalizing and a demotion in substance and that his Manager's withholding of the actual details of the new job description were, in fact, deliberately deceptive by design and a key component of the disparate treatment and ploy itself.

36. Plaintiff's Manager Plaintiff Manager Michael Glendenning then hired a Caucasian employee into the title and role that he forced Plaintiff out of.

37. In addition to being discriminatory, Plaintiff's Manager Plaintiff Manager Michael Glendenning committed two additional discriminatory acts.

38. First, Glendenning manipulated the requirements for the job description. When Plaintiff applied for the role a college education was an unconditional requirement. Glendenning removed this requirement for the Caucasian employee.

6

39. Second, the Caucasian employee, Kyle Baumgardner, had no prior logistics Facility experience which was an additional unconditional requirement. Glendenning removed this requirement for the Caucasian employee as well.

40. On or about October 12 and 13 2022 Plaintiff was subjected to disparate treatment when he was excluded and denied on the basis of his race and color the opportunity to participate in a professional training and development exercise referred to as a Kaizen continuous improvement exercise session.

41. The focus of the Kaizen exercise was the operational processes and continuous improvement of facility operations for end to end process identification and development.

42. Plaintiff is the Business Operations Specialist and Business Analyst for the ASC Facility Operations. As such, all facility operations cost, quality, performance, risk management and industry standards are within his scope. Plaintiff has functioned in this capacity since November of 2019.

43. Although I was the most experienced and accomplished member of Plaintiff department in facility operations and expressly requested the opportunity to participate, I was denied and excluded by Management while Plaintiff lesser experienced and recently hired non protected employee of Caucasian descent Kyle Baumgardner was selected to participate over me.

44. When Plaintiff requested an explanation why Plaintiff was excluded in favor of Kyle Baumgardner no explanation was provided.

45. A Kaizen event is a "benefit" and "training" and "promotional" opportunity in Subject Matter Experts, Management and Executives participate in a joint collaborative effort to solution Problems of significant interdepartmental operational and financial

7

consequence. Is an opportunity to interact with, get face time with, share, and learn about separate but related departments and how they can or do intersect with one another and from multiple levels.

46. The Kaizen and experience and achievements related thereto are mandated by Executive Charter and carry substantial performance, training, and promotional value and recognition. I was deprived of this opportunity in favor of a newly hired, lower level non protected employee with less experience.

47. Plaintiff was professionally and financially prejudiced in the terms, conditions, roles, responsibilities and benefits of his employment by this disparate treatment.

48. This disparate treatment was the direct result of a tacit agreement by Greg Margosian, Steven Mensch, Scott Enke and Plaintiff Manager Michael Glendenning the object of which was to discriminate against the Plaintiff on the basis of his race by the disparate act of excluding him from and denying Plaintiff to be included in the Kaizen event in favor of Kyle Baumgardner and their actions in the furtherance of this unlawful civil conspiracy.

49. In an effort to cover up the disparate exclusion of the Plaintiff, the Defendants falsified a document to misrepresent the truth as though the Plaintiff was present and included.

50. In August 2020 Plaintiff then Boss, Director Greg Bossi, informed me that there was an opportunity for the business to bring in additional business in the form of the Walgreens contract.

51. Greg Bossi explained that the opportunity was being presented to us by Mark Johnson who was/is the owner of the TOSHIBA Walgreens contract.

52. Greg Bossi explained, however, that the "Order Fulfillment Contract Opportunity" was predicated on a "Demand Planning Solution" that the company did not have.

53. At that point we had several conference calls with IT Business Analyst Laura Stangoni who determined it was not possible to provide a solution.

54. There was a second conference call with TOSHIBA Senior IT SME Kalai Sulur who also concluded it was not possible.

55. Greg Bossi asked me if I had a solution, and I confirmed that I did. The Demand Planning solution was an Excel based Decision Support Forecasting Tool.

56. The Tool was reviewed by Plaintiff then boss Director Greg Bossi, Michael Glendenning and as well as tested by Mark Johnson' Team (Joel Miller) and approved.

57. At this point an SOW (Contract) was created which defined the nature and scope of Plaintiff obligation regarding the creation, management, and distribution of the solution.

58. In November of 2022, Joel Miller (Senior Walgreens Program Manager for TOSHIBA) who manages the contract for Mark Johnson decided that he wanted me to "take over and become responsible for the reconciliation of Purchase Orders created by his Team from the Maintenance Service Department.

59. This demand represented a substantial change to the "Terms, Conditions, Roles, Responsibilities, Scope, and Privileges of Plaintiff employment.

60. First, the "Statement of Work" (Contract) which constitutes the Service Level Agreement between Plaintiff department and the maintenance Services Department and defines the "Terms, Conditions, Roles, Responsibilities and Scope" of Plaintiff duties as it related to Demand Forecasting Tool.

9

61. The new demands by Joel Miller were "adverse actions" in that:

62. They were outside the scope of the SOW.

63. It was already agreed that Joel's Team would reconcile and update the status of the Purchase Orders they were creating.

64. It allowed Joel Miller to adversely shift the Purchase Order management responsibility from themselves to me.

65. This meant I would become obligated to do take on responsibilities of another department and track and reconcile Purchase Orders created by numerous individuals to which it was already agreed would be their responsibility.

66. The Policy and Practice of TOSHIBA is and has always been that creators of Purchase Orders are required to track, validate, reconcile, and manage their own Purchase Orders.

67. No Caucasian employee within TOSHIBA has ever been required to manage or reconcile Purchase Orders which they did not create,

68. In November 2022 Plaintiff Manager Michael Glendenning admitted in writing that this was not Plaintiff responsibility and that it constituted a deviation from the SOW contract.

69. Moreover, it constituted an adverse change to the Terms and Conditions, role, responsibilities, scope of Plaintiff employment in that it allowed the Client Advocates and Joel Miller to delegate their PO Management and reconciliation responsibilities to me. This also substantially administrative burden of increased work volume.

70. I asked Michael if this could be delegated to Pamela Rogers who was in charge of PO management for our department and Plaintiff Manager Michael Glendenning stated "No."

10

71. In April 2023, Plaintiff Manager Michael Glendenning ordered me to do this in violation of the SOW contract.

72. In April 2023 I explained to Plaintiff Manager Michael Glendenning that I felt like I was being "harassed" and that there was "fraud" and "misconduct" at play (Ex  ).

73. Two weeks later On April 11th, 2023 Plaintiff Manager Michael Glendenning called me into his office and told me to "delete" a significant number of Plaintiff goals from the Performance Review system.

74. This was three days before Plaintiff Performance Review was due to be conducted by him and almost a year after he, himself, had approved Plaintiff goals in the system. This was retaliatory and provocative.

75. Plaintiff goals had been submitted almost a year prior at the start of the fiscal year as was policy and practice. 28.Furthermore, Plaintiff Manager Michael Glendenning had "approved" these goals in the H.R. database when I submitted them at the beginning of the Fiscal year.

76. Plaintiff Manager Michael Glendenning's demand for me to delete Plaintiff goals was a contradiction in that he "approved" them before months later asking me to delete them immediately after I "spoke out" about the disparate and unlawful conduct.

77. Moreover, I had been working and striving towards these goals for the better part of a year.

78. When I asked him why he was directing me to delete Plaintiff goals he responded that Plaintiff "goals were not goals". He said they were tasks.

79. I asked him why he approved Plaintiff goals a year prior if he truly felt that way. Michael replied he "did not owe me any explanation."

11

80. I asked Plaintiff Manager Michael Glendenning why he was just now bringing this to Plaintiff attention three days before Plaintiff Performance Review and he replied he did not owe me an explanation.

81. I then asked him to help me understand his rationale for why the goals which he approved almost a year earlier, and he replied he did not owe me an explanation.

82. I walked to Plaintiff desk and immediately documented the situation by creating an email which included HR Senior HR Rep Patrick Tarry; Plaintiff Manager Michael Glendenning himself; Director Scott Enke (Michael's Manager at the time) and Vice President Steven Mensch (the head of our Department World Wide Ops).

83. I emailed Micheal Glendenning again two days later on April 13, 2023 entitled "Goals versus Tasks" wherein I cited a link to Harvard University Business School which explained the definition of Strategic Operational Goals and supported Plaintiff point. I also included HR Rep Patrick Tarry; Steven Mensch; Adershan Dhillion; Scott Enke and Mahesh Mecheri. The Title of the Harvard Business Article was "How To Set Strategic Planning Goals."

84. I explained in this communication "All of Plaintiff Goals were submitted almost a year ago and have been worked on to bring to fruition and have "added value" Business Impact relative to the Executive Parent Goal.

85. I explained I had done nothing different than usual.

86. I explained the issue was brought to Plaintiff attention in the 11th hour almost a year later and several days before Plaintiff Performance Review was due.

87. I explained that the Havard Business School definition was consistent with Plaintiff Goal submissions.

12

88. I explained Plaintiff Manager Michael Glendenning provided no basis to explain why Plaintiff goals (already achieved) all of a sudden did not qualify his definition.

89. I explained that I was refusing to delete them.

90. This adverse action was both disparate in nature as well as retaliatory.

91. Michael knew Plaintiff Goals were legitimate and that if he assigned them their individual value the total score rating would place me to the right of the TOSHIBA "NORMAL PERFEORMANCE RATING BELL CURVE" amongst the 14%-2% high performers within the company.

92. However, Michael's intent was to prevent me from being rated accurately within the 14%-2% of high performers of the company so he was seeking a way to withhold the full value of points warranted by Plaintiff achievement of each goal.

93. Michael undervalued Plaintiff actual rating score by, instead of assigning a value to each goal, as was policy and practice, he consolidated Plaintiff goals and assigned values to them collectively so that each goal achieved would not be weighed and valued individually.

94. This was a deviation from policy and practice, and it reflects Michael's unlawful intent.

95. The harm is that I was intentionally cheated out of the full value of Plaintiff Performance score and deprived of the "Pay For Performance" salary bonus I was      .

96.        On April 27, 2023 Plaintiff Manager Michael Glendenning emailed me Plaintiff 2022 Year End Score of "3" which constituted Meets Expectations which is the equivalent of a "C". 50.This was the same year I received an Award of Distinction from the Senior Vice President Steven Mensch for Plaintiff concept development contributions to Oracle WMS for "Primary Pick Sequence" functionality and "Short Pick Enablement" functionality which both enhanced Operational Infrastructure for the business model. It

13

was also the same year I completed the CRU & FRU Real-Time Dashboards for the Fulfillment business model.

97. There was nothing average about Plaintiff accomplished Goals in 2022. To undervalue an employees' performance constitutes fraud.

98. I set more precedents than anyone else in Plaintiff department Manager or non-Manager.

99. I have created more tools and developed more processes than anyone else in Plaintiff department Manager or non-Manager.

100. I have created more financial cost savings for the company than anyone else in Plaintiff department Manager or non-Manager.

101. According to the ratings criteria I should have received at least a "4".

102. Michael's deliberate undervaluation of Plaintiff FY 2022 End of Year Performance Review score was fraudulent.

103. On Plaintiff Manager Michael Glendenning requested that I create 8 statistical charts for QBR (Quarterly Business Review) presentation with the Maintenance department. The purpose of the charts is to illustrate the current health and status of the business model based open Cost, Quality and Management systems that I created for the business, and which have been adopted by the business as Standard Operational Practice.

104. I am a Subject Matter Expert in the Management systems I have created for the business.

105. However, I was told by Michael Glendening and Steven Mensch that I would be excluded from these meetings because they were strictly Manager meetings but that Kyle Bumgardner who was recently hired at an entry level Business Operations Specialist I, below Plaintiff title and with far less experience with the subject matter would be present during the QBR sessions to listen, observe and present.

14

106. I was specifically hired by the Director and Executive Director to present to Upper Management and in the past, I have presented regularly as part of Plaintiff duties to Managers, Directors and above.

107. It stands to reason that I would be included and allowed to participate and present in the Management systems which I conceived and introduced to the business and for which I am the Subject Matter Expert. 62.If Plaintiff analytic and diagnostic CLASSIFICATIONs, recommendations, and conclusions inform and enrich decision making of management then Plaintiff presence should be as equally welcome as Kyle Bumgardner. The fact that it is not reflects disparity.

108. In this context, the exception proves the rule.

109. Plaintiff Manager Michael Glendenning then decided that he was going to cancel all of Plaintiff "One on One" meetings with him for the entire 2023.

110. TOSHIBA policy and practice expressly states that Managers have a duty to provide direct reports with "One on One" meetings during the year.

111. Plaintiff Manager Michael Glendenning provided all of his direct reports with "One on One" meetings but canceled all of Plaintiff "One on One" meetings for the entire year.

112. Regular and documented "One on One" meetings are a proscribed pre-requisite criteria of the "NINE BOX QUALITATIVE PERFORMANCE RATING FORMULA CLASSIFICATION" (Ex ).

113. "Objective" fact based findings are a proscribed pre-requisite criteria of the "NINE BOX QUALITATIVE PERFFORMANCE RATING FORMULA CLASSIFICATION".

114. "Consistency" between and across employees is a proscribed pre-requisite criteria of the "NINE BOX QUALITATIVE PERFFORMANCE RATING FORMULA CLASSIFICATION".

15

88. Plaintiff Manager Michael Glendenning and HR Rep Patrick Tarry knowingly, intentionally and in coordination with one another and James Fornabaio and Steven Mensch targeted Plaintiff by selective disparate application of the "NINE BOX QUALITATIVE PERFFORMANCE RATING FORMULA CLASSIFICATION" by **a)** suspending and denying Plaintiff of all routine bi-weekly "One on One" meetings for the entire year, submitted knowingly submitted **b)** false or **c)** incomplete, and **d)** erroneous CLASSIFICATION, **e)** abandoned objective findings for bias distortions, **f)** omission of material facts and **g)** deliberate "inconsistent application" of formula for the sole purpose of adversely skewing the formula output mis-label Plaintiff, defame him in his workplace reputation, harm him in the terms, conditions and benefits of his employment on the basis of his race and in retaliation for exercising his protected right to challenge such discrimination, cover up such unlawful conduct, and obstruct, subvert and undermine the federal EEOC investigation.

116. The fact that this process was being conducted in secret is evidence of both gamesmanship and consciousness of guilt. Lawful business practice and industry standards require performance metrics CLASSIFICATIONs to be a transparent process.

117. By shrouding this practice in covert and clandestine tactics reveals that they did not want their discriminatory and unlawful manipulations of this process made known and was done in the furtherance of the unlawful conspiracy.

118. Plaintiff Manager Michael Glendenning proceeded to provide false "NINE BOX QUALITATIVE PERFORMANCE RATING FORMULA CLASSIFICATIONS" as if he and I had been having "One on One" meetings which was a fraudulent misrepresentation and misapplication of the "NINE BOX QUALITATIVE PERFORMANCE RATING FORMULACLASSIFICATION" policy and practice.

16

119. In June 2023 Jenea Law, Toshiba Project Manager contacted me by email and informed me that, as part of the Tractor Supply Contract opportunity, the company was requested by Tractor Supply to provide RMA Admin external Vendor Management.

120. Jenea later reached out to me via Teams chat and asked me if I was familiar with the process and I responded that I was and that I had coordinated the Walgreens RMA workflow process for Toshiba and created and developed the Kroger RMA workflow process for Toshiba as Well as the Sams Club RMA workflow process for Toshiba.

121. Jenea asked if I could share the RMA workflow process that I created for the facility to service these customers with her and also help her create an RMA Service workflow that we could market and sell as a service for Tractor Supply. I agreed to do this for her and on behalf of the company.

122. Jenea and I developed a mutual agreement where I would provide the workflow process I had already developed and that she would coordinate with me to ascertain what products Tractor Supply would need RMA service for and any necessary account information or authorizations and I would research the process required for each Tractor Supply inventory Item and get the accounts set up and administratively ready from the Toshiba side.

123. Once Jenea and I were done she packaged the information into a Powerpoint template, put her name on the cover as creator, omitted Plaintiff name completely from the entire document and added the names of Rebbeca Miller and Rabecca Miller's son Noah Morales next to her name as the authors of the process document.

124. Jenea then presented the RMA Service process document to Toshiba Vice President Steve Fox with her name (Jenea Law), Rabecca Miller's name and Rabecca's son Noah

17

Morales name on the cover as the creators of the Tractor Supply RMA Service process document for him to sign off on and approve which he did.

125. Jenea Law then forwarded this RMA service process document to Tractor Supply Executives with these three names on the front as if to imply that she, Rebecca Miller, and Rebecca's son had created the RMA service process package for Tractor Supply.

126. This exclusion was an adverse action in that I was denied equal credit and recognition for creating the workflow process which was Plaintiff work product but also by misrepresenting that she, and two other Caucasian employees were solely responsible for what was, in fact, Jenea and I joint work product.

127. At no time did Jenea ever correct or clarify to the Toshiba Executive Team or Tractor Supply Executives or Management that she and I were in fact both jointly responsible for creating the service package.

128. It is fraudulent, unethical, and unconstitutional to take credit for the work product from the actual creator of the work product and to assign credit for the work product to other employees who the employee knew or reasonably should have known were not responsible for it.

129. Depriving me of recognition and credit for Work Product created by me was discriminatory, subversive, undermining.

130. Depriving me of recognition and credit for Work Product created by me and further falsely attributing Plaintiff work Product to the efforts of Caucasian friends and colleagues who were not involved was discriminatory.

131. Additionally, after being permitted to participate in the initial Interdepartmental Kaizen in September 2023, which was a collaborative brainstorming exercise regarding adding and troubleshooting operational components of the ASC business model in

18

collaboration with Middle Management and Upper Management, I was then denied the opportunity to participate in the subsequent sequels of these in the following months even though Plaintiff name was falsely reflected on the list as if I had been included.

132. Including Plaintiff name on a series of meetings as though I was a participant when, in fact, I was never allowed to participate in these subsequent sessions was the falsification of a business record and represents an attempt to cover up and conceal evidence of this adverse discriminatory and retaliatory act.

133. There was no reason for me to be excluded from the subsequent Kaizen proceedings.

134. I was and still am an acknowledged Subject Matter Expert in the areas of operations which the Kaizen meetings related to.

135. The Kaizen exercises are developmental in that they represent an opportunity to interact with Managers and SMEs from other departments of the business and are cross functional continuous improvement and development Projects.

136. They have both, developmental value, Performance Value, Performance Review Value and Promotional Value.

137. By denying me the opportunity to participate, I was denied each of the above.

138. In contrast, Kyle Bumgardner, who is not a Manager, does not have equal or near equal experience with the ASC business model or equal formal education was permitted to attend each of the subsequent Kaizens that I was excluded from.

139. This exclusion was targeted, discriminatory, retaliatory and without basis.

140. On 9/12/2023 Plaintiff Manager Michael Glendenning called me into his office where he was sitting with HR Rep Patrick Tarry and handed me a disciplinary charge report

19

authored by himself alleging that I had violated disciplinary rules by copying the CEO on three emails.

141. The disciplinary report authored by Michael I was directed by Scott Enke in writing not to include him on any communications without his permission. You were on copy. So you knew full well I was directed by him not to copy him without his consent. Therefore, your allegation that I "left Scott Enke out" is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

142. The disciplinary report went on to state that the charges constituted a "Final Warning" after which Plaintiff employment would be terminated should I copy another member of the Executive Team on email. 93.During the past almost five years of Plaintiff employment I have only cc'd the CEO on approximately 5 communications (approximately once a year) and each of these communications have been in good faith.

143. Additionally, such disciplinary charge is disparate and selective because many Caucasian members of the company at Plaintiff same or similar level have been freely welcomed and encouraged to copy him or email him directly on a far more frequent basis than 5 times over almost 5 years.

144. In the disciplinary report stated there was "no reason" to copy senior levels of management in Plaintiff emails to other employees. This meant he did not want his Superiors notified.

145. It is both Corporate Custom and Common Practice to keep senior leadership abreast of important topics by including them on copy. As such, this is the only reason I need. No other reason is required.

146. As such Plaintiff Manager Michael Glendenning statement was a misrepresentation of fact and defamation.

20

147. Plaintiff Manager Michael Glendenning Stated I had been "repeatedly told about the proper escalation process".

148. However, I had one isolated exchange with Steve Mensch on August 25th, 2023 wherein he explained the escalation path he preferred I follow. And so, contrary to Michael's allegation, there was no repetition.

149. Michael's allegation that I was "repeatedly told about the proper escalation process" is both a fraudulent misrepresentation of the facts and a defamation against Plaintiffself in the workplace.

150. Michael alleged that I failed to follow the proper escalation process.

151. I reported risk to the business in good faith and based on credible facts pursuant to TOSHIBA Standards of Conduct as required by the Board of Directors.

152. The Board of Directors made no such stipulation. To the contrary, the Board of Directors explicitly stated an employee had the option of bypassing middle management if the report was being made in good faith.

153. Therefore, Michael's allegation that I failed to follow the proper escalation process is both a fraudulent misrepresentation of the facts and a defamation against Plaintiff in the workplace.

154. Plaintiff Manager Michael Glendenning stated in his disciplinary report that he felt I "escalated him" to the CEO Rance Pohler. And so admitting he was taking retaliatory action against me for such.

155. Such retaliatory conduct violates both Federal law and Toshiba policy and practice to which complainant as an employee is entitled.

156. However, contrary to Michaael's accusation, the communication was not an escalation.

21

157. An escalation is a communication where 1) the communication is addressed directly to the Superior employee. 1) Plaintiff communication was not addressed to Rance. Plaintiff communication was addressed to you. 2) Second, an escalation is one where a complaint is being made about a failure to act or resolve at the lower level. I never made any complaint or allegation in Plaintiff communication that you had failed to act or resolve. To the contrary I congratulated you on "Succeeding where I had failed" and commended you. That does not constitute an escalation of a complaint about you. To the contrary, it is a compliment. I was complimenting you with Rance on copy.

158. There was no basis for you to interpret Plaintiff communication as an escalation. 3) Third, the final key element of an escalation is that the party escalating makes a request to the higher authority for some form of intervention and resolution to an open issue. I made no such request of Rance. Hence Plaintiff communication to you with Rance on copy was nothing more than me keeping a senior member of Leadership abreast which is completely in line Corporate "Custom" and "Common Practice".

159. Therefore, your allegation that I escalated you to Rance is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

160. Fifth, Plaintiff Manager Michael Glendenning stated that I "left Scott Enke out of Plaintiff August 25th, 2023 communication".

161. However, contrary to Michael's allegation, I was expressly directed by Scott Enke in writing not to include him on any communications without his permission. You were on copy. So you knew full well I was directed by him not to copy him without his consent. Therefore, your allegation that I "left Scott Enke out" is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

22

162. Plaintiff Manager Michael Glendenning alleged that Plaintiff September 1, 2023 communication responding to Rebecca Miller with Rance on copy violated a directive given to me by HR Rep Patrick Tarry on August 29th, 2023.

163. Plaintiff Manager Michael Glendenning was not physically present or anywhere around when I spoke to HR Rep Patrick Tarry on August 29th, 2023 so he was reciting hearsay and gossip as the basis for his accusation. Patrick never told me I was prohibited from keeping Rance abreast of a situation if it fell within the criteria expressly set forth by the Board of Directors regarding a) risk and b) good faith of which Plaintiff September 1, 2023 communication met both criteria. Therefore, your allegation that Plaintiff September 1, 2023 communication where I copied Rance violated a directive given to me by HR Rep Patrick Tarry is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

164. Seventh, Plaintiff Manager Michael Glendenning alleged that Plaintiff September 1, 2023 email to Rebecca Miller violated Steve Mensch August 25th, 2023 communication about using management chain.

165. However, Plaintiff September 1, 2023 communication was expressly authorized in writing and obligated by the Board of Directors in Toshiba Standards of Conduct protocol, and I was, therefore, acting within the scope of Plaintiff duties as I understood them to be.

166. Therefore, your allegation that Plaintiff September 1, 2023 communication where I copied Rance violated a directive given to me by Steve Mensch is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

167. Plaintiff Manager Michael Glendenning alleged in the disciplinary report that when Steve Mensh asked why I copied Rance on Plaintiff September 1, 2023 email "I gave no clear reason".

23

168. I gave a very clear reason that met both criteria a) and b) of the Board of Directors requirement. And Steve Mensch responded: "I get that".

169. Therefore, Michael's allegation that when Steve Mensch asked why I copied Rance on Plaintiff September 1, 2023 communication "I gave no clear reason" is both a Fraudulent misrepresentation of the facts and a Defamation against Plaintiffself within the workplace.

170. Plaintiff Manager Michael Glendenning alleged that I "repeatedly failed on numerous occasions to follow our guidelines".

171. The reason why Plaintiff Manager Michael Glendenning failed to cite any written corporate guidelines that I violated is because there are no written corporate guidelines that I have violated...(not a single one).

172. There is no written protocol or formal escalation process other than the one crafted by the Board of Directors which I am in line with.

173. The false representations were known to be false by Plaintiff Manager Michael Glendenning at the time he authored the disciplinary report and were knowingly stated by him with the intent to deceive and injure by means of adverse action by the corporation and has deceived and injured and resulted in adverse action.

174. The charge that I violated some existing policy which prohibits cc'ing an Executive member of Leadership is a false charge as no such policy exists nor has such policy ever existed within the company during the entire tenure of Plaintiff employment. Michael Glendening has fabricated the existence of such policy in an effort to give credence to an otherwise baseless disciplinary charge.

175. I have reached out to Executive members countless times in the past for good cause without it resulting in any form of disciplinary or admonishment. And Executive members

24

have reached out to me as well. There has never been any barrier or adverse action until this action taken by Plaintiff Manager Michael Glendenning now. This is unprecedented and discriminatory.

176. Even since before I came to this company white employees have enjoyed the privilege of CC'ing Executive Leadership on emails and have always been encouraged to do so even now. The fact that this is a privilege reserved for white employees within the company is by definition Per Se discriminatory and that a nonwhite employee would suddenly be targeted and subjected to adverse disciplinary action for exercising the very same privilege is clearly unlawful. No white employee with Plaintiff title or similar role has ever been brought up on disciplinary charges for copying a member of Executive leadership on an email. It is literally unheard of. The fact that this has never been done in the past is evidence in and of itself that Executive Leadership understands it would be wrong to do so.

177. Further evidence that this charge is racially based and discriminatory is the fact that Michael Glendening has, himself, cc'd Executive Leadership on emails in the past without ever being subjected to any disciplinary action. In fact, copying members of Leadership at ones discretion has been both custom and common practice within the company so long as they are stakeholders in some way to the Subject Matter.

178. A Manager cannot abuse the authority entrusted to them by the Corporation to commit acts prohibited by Federal Law specifically and in contravention of Public Policy generally.

179. Federal law states that I, as a employee, have a right to exercise the same rights and privileges of white employees similarly situated which include, among other things, the

right to copy a member of Executive Leadership on an email in good faith if and when the subject matter warrants it so long as this privilege is not abused or offensive.

180. The Toshiba SOC (Standards of Conduct) have been authored and published by the Board of Directors to which the Executive Members are answerable. There is no right that the Board of Directors can give to employees that a Manager has the organizational authority to revoke, take away or override. Such power or authority is not inherent in the role of such Manager by virtue of the Corporate Charter. This is not possible any more than it is feasible for a member of City Council to revoke a right bestowed by the U.S. Senate. There is a Supremacy Clause the prohibits such inverse exercise of authority. Likewise, there is no corporate law that empowers a Department Manager or VP to overturn the express written escalation clause extended to employees by the Toshiba Board of Directors to escalate when such escalation is in regards to risk to the company and in good faith.

181. By taking disciplinary action against me for Plaintiff September 1, 2023 email where I copied the CEO, Plaintiff Manager Michael Glendenning did exactly what the Board of Directors said not to do.

182. "Employees who provide Risk Compliance information for good reason and in good faith must not be treated disadvantageously on the grounds that they provided such information." -Board of Directors, Toshiba Standards of Conduct.

183. During this same meeting HR Rep Patrick Tarry and Plaintiff Manager Michael Glendenning propositioned me to sign a prepared resignation contract agreeing to quit Plaintiff job in exchange for $40, 000. I declined this offer in writing and expressed that I would not be bullied out of Plaintiff job. I copied Plaintiff Manager Michael Glendenning, HR Rep Patrick Tarry and Steven Mensch on this communication.

26

184. On September14th, 2023 Plaintiff Manager Michael Glendenning joined a Teams call I was invited to participate in and had been participating in daily for several weeks and without explanation or advance notice directed me to remove Plaintiffself from the call and not to rejoin such calls going forward in front of everyone.

185. Not only was this unwarranted but it was also professionally embarrassing and intended to stigmatize me in the presence and minds of the seven or eight employees who were also present on the call at the time.

186. On the morning of September 15th, 2023 I was participating in a call with numerous TOSHIBA employees and Tractor Supply employees as I had been invited to participate in daily for several weeks.

187. During this time, Plaintiff Manager Michael Glendenning joined and, without notice or explanation directed me in the presence of all TOSHIBA and Tractor Supply employees to remove Plaintiffself from the call and not return.

188. Not only was this unwarranted but it was also professionally embarrassing and intended to stigmatize me in the presence and minds of the seven or eight employees who were also present on the call at the time.

189. I immediately sent Plaintiff Manager Michael Glendenning an email pointing out that he had done this repeatedly and without cause, asking him why he had excluded me from these calls and why he had communicated this to me in such an stigmatizing and unprofessional manner.

190. Plaintiff Manager Michael Glendenning did not respond. I again followed up on September 18th, 2023 with an email asking why he had done this.

191. Plaintiff Manager Michael Glendenning responded that the Tractor Supply call was for Executives. 162. I replied to Plaintiff Manager Michael Glendenning that most of the

27

12-13 individuals who routinely participated on the call were not Executives at all but owners of some part of the project providing status updates as was I.

192. It was disparate for Plaintiff Manager Michael Glendenning to target me out of all the 11-12-2023 TOSHIBA employees who participated on the call and exclude me from the meetings for which I played a significant role. No Caucasian TOSHIBA employees were removed from the daily meetings.

193. On November 29th, 2023 Plaintiff Manager Michael Glendenning called me into his office and began intimidating, harassing, and forcefully attempting to coerce me in a targeted manner in the presence of Bob Hunsinger and Pranav Patel for copying Plaintiff cross functional project coworkers on an email regarding service breakdown risk and root cause analysis.

194. Michael proceeded to reprimand me in front of Bob Hunsinger and Paranv Patel about engaging in what he termed "Finger Pointing Games" by me and that he did not want me emailing Pranav if there was a question about process compliance, he wanted me to go and walk to Pranav's desk and inquire verbally and that he was prohibiting me from copying or communicating service process issues with anyone outside of our department going forward.

195. This intimidating, bullying and coercive conduct was selective and disparate and retaliatory in nature.

196. I was lured into this confrontational and antagonistic situation by Plaintiff Manager Michael Glendenning.

197. It was disrespectful for Michael to accuse me of unethical conduct in the presence of Bob Hunsinger and Pranav Patel.

198. It was disrespectful for Michael to tell me not to make inquiries via email.

28

199. It was disrespectful for Michael to tell me that instead of emailing Pranav I was required to leave Plaintiff cubicle to go look for him and question him verbally.

200. It was undermining for Michael to tell me that I was prohibited from communicating with personnel outside the department about service process matters.

201. No Caucasian employees have ever been subjected to such employment restrictions.

202. At all times I was acting within the scope of Plaintiff duties.

203. I wrote and complained to HR Rep Patrick Tarry and HR Rep Patrick Tarry told me he was not getting involved and that it had nothing to do with HR.

204. Published Corporate mandate required "All Managers to have Performance Reviews completed and submitted by October 27th, 2023.

205. However, the EEOC investigation of Plaintiff situation was still open and active at this time.

206. In a calculated effort to circumvent the EEOC investigation Respondent completed the review of all other employees in Plaintiff department by October 27th , 2023 but deliberately singled me out and withheld Plaintiff Performance Review until 47 days after the October 27, 2023 Corporate deadline passed and after the EEOC investigation into Plaintiff complaint had closed in a conscious effort to retaliate while concealing such retaliation by means of circumvention and obstruction of the EEOC investigation.

207. In Plaintiff Performance Review Plaintiff Manager at Respondent Plaintiff Manager Michael Glendenning (Caucasian) used both an undefined criteria and fraud to reduce Plaintiff performance rating score to a substandard level.

208. Mr. Glendenning then said addressing the undefined criteria alleged that in order to receive a level 5 rating I "Needed to walk on water".

29

209. The Standard of Performance he referenced was to emulate Jesus Christ. No white employee has ever been required to emulate the supernatural acts of Jesus Christ.

210. This was a irrational, unachievable and discriminatory Standard of Performance being applied to Plaintiff review.

211. He then went on to add "automation" when I had previously asked him for a budget to do this several months earlier and he denied me.

212. This Standard was not only unachievable but contradictory and had nothing to do with Plaintiff goals which he had approved a year earlier with no such stipulation.

213. This was a Standard of Performance that both he and HR Rep Patrick Tarry verbally admitted he "made up on the Fly" in the moment and was applying to Plaintiff Performance Review retroactively.

214. This contradicted the principle of "fairness" which, according to Corporate policy, is supposed to govern Performance Reviews.

215. Michael also alleged I had received the Performance rating because I was a) "accusatory" and b) allegedly "said something confusing to a customer on a call".

216. Michael never defined "accusatory". Nor is "Accusatory" to be found anywhere in the Rulebook or Corporate policy.

217. Both accusations were fraudulent pretexts for retaliation.

218. Michael and Patrick both admittedly, never afforded me knowledge or understanding into the evidentiary basis of these blanket fraudulent allegations of who I was accusatory to, how was I accusatory, when did this happen or what accusatory means in an effort to avoid transparency of such particulars and successfully deprive me of the ability to respond and expose such fraud.

30

219. Michael and Patrick never afforded me knowledge and understanding into the evidentiary basis of these blanket fraudulent allegations of who I allegedly confused, how I said something confusing, in what manner did this confusing statement allegedly occur and when did this happen in an effort to fraudulently conceal transparency of such particulars and successfully deprive me of the ability to respond and expose such fraud.

220. Michael also took the opportunity to use Plaintiff Performance Review as part of his coercion campaign to punish me for documenting poor business practice inquiries via email in furtherance of his express directive of concealment which is unethical and contradictory to Corporate Policy and so should not be a basis for poor performance.

221. This was coercive, threatening, intimidating and discriminatory and evinced a text-book Conflict of Interest with Corporate policy and his own personal agenda of concealment which I had reported to HR.

222. No Caucasian employees have ever been punished for sending process compliance inquiries via email.

223. Mr. Glendenning and HR Rep Patrick Tarry also alleged that the low score they gave me violated the Goal Improvement Notice initiated against me although it had been removed from Plaintiff dashboard as a Management Goal.

224. Mr. Glendenning was able to reduce Plaintiff performance rating because Senior Human Resources Business Partner HR Rep Patrick Tarry (Caucasian) allowed him to do so by reconfiguring the scoring matrix to allow for additional points to be deducted in numerous parts of the review on a fraudulent basis.

225. Later that day Mr. Glendenning said that I was "going to regret reporting to the EEOC" and said that "the EEOC can't do anything".

31

226. On December 13, 2023 I sent an email to Plaintiff Manager Michael Glendenning Manager Steve Mensch, Senior VP. In the email I asked him to review Plaintiff performance CLASSIFICATION both on the merits and the process on the basis of discrimination, retaliation, Coercion, Conflict of Interest, and several other grounds.

227. Steve Mensch completely ignored Plaintiff communication and never responded at all. 196. Steve Mensch wanted to be able to claim plausible denial of any knowledge of wrongdoing.

228. Steve Mensch supported, condoned, tacitly agreed, acquiesced, and facilitated this conspiracy to violate Plaintiff civil rights by deliberately ignoring, failing to review, failing to investigate failing to enforce and acting in concert to cover up after the fact by omission and by "conscious avoidance of knowledge". Steve Mensch wanted to avoid being bound by his fiduciary duty to take corrective action.

229. On April 23rd, 2024 Plaintiff Manager Michael Glendenning submitted a 2023 Year End Performance Review in which he determined that Plaintiff overall performance rating was 2.8. 199. Plaintiff Manager Michael Glendenning determination was based upon a series of factual misrepresentations put into the record by him in an effort to fraudulently manipulate a false narrative of events and then rely upon them as evidence of Plaintiff alleged misconduct.

230. Plaintiff Manager Michael Glendenning determination was also based upon his knowing and intentional omission of exonerating and/or mitigating facts which he did not note or include in the review.

231. In addition to manipulating the record to create a false narrative, Plaintiff Manager Michael Glendenning deliberately undervalued Plaintiff submitted work product and

32

overvalued the false misconduct allegations to facilitate a false calculation and orchestrate an underperformance rating outcome.

232. Lastly, Plaintiff Manager Michael Glendenning fabricated charges non-existent within the company rulebook or any other policy statement and contrary to Corporate Governance as well as selective in that such charge has never been used against any white employee under similar circumstances by Plaintiff Manager Michael Glendenning or the company. This conduct is selective.

233. Falsifying the business record and suppression of exonerating and/or mitigating facts and evidence material to the facts in question in the course of facilitating discriminatory and disparate treatment and retaliatory adverse action violates the Federal Statute and federal Judicial Law.

234. Moreover, the knowing and willful effort to distort the record by concealing exonerating and mitigating facts when one knows such subject matter is material to an active federal investigation constitutes cover up and obstruction.

235. The fact that Plaintiff Manager Michael Glendenning was aided in this effort by Steve Mensch and HR Rep Patrick Tarry constitute the basis for civil conspiracy to violate complainants rights.

236. The intended result of this wrongful conduct was to prejudice the complainant in his performance review based on fraud and to utilize this fraudulent outcome as a tactic to then serve as a Glendenning submitted a 2023 Year End Performance Review wherein, he determined that Plaintiff rating was a "2.8" below standards.

237. Glendenning determination was based upon a series of deliberate fraudulent misrepresentations put into the record by him to create a false narrative and then relied upon by HR as evidence of my alleged misconduct.

33

238. Among Glendenning knowingly and falsely misrepresentations was that I had acted in a hostile manner towards a fellow employee on November 29, 2023 during a meeting.

239. Additionally, Glendenning knowingly and falsely alleged that I was called out TOSHIBA and a customer in an email in October 2023 and was unprofessional.

240. Furthermore, Glendenning again alleged without any specifics or evidentiary basis that I had acted in an accusatory manner according to some undescribed conduct, on some unspecified date, towards some unidentified coworkers of which I was never previously informed between October 2023 and April 2024.

241. In addition to fraudulently manipulating the record via false misrepresentations, Glendenning intentionally mis-quantified and undervalued Plaintiffs work product according to company rating directive which sets forth the criteria that entitled Plaintiff to a "4.5" rating.

242. This was done to orchestrate and justify an underperformance rating outcome.

243. The charges fabricated against Plaintiff by Glendenning are non-existent in the company rule book or any other policy statement and contrary to corporate governance as well as racially selective and discriminatory, disparate and retaliatory.

244. Falsifying the business records and suppression of exonerating evidence and mitigating facts material to determination in the course of facilitating disparate, defamatory and retaliatory adverse action harmed Plaintiff in his reputation in the workplace socially and professionally and financially as he was denied bonus pay he would have otherwise been entitled to.

245. The knowing and willful effort to to distort the record by concealing exonerating and mitigating facts when one knows such subject matter is material to the outcome of an

34

active federal investigation constitutes cover up and obstruction and violates Plaintiffs federal right to due process and seek redress.

246.     On May 6, 2024 I filed an Amended Complaint regarding the April 23, Performance Review violations as well as the fraudulent classification inputs for the NINE BOX QUALITATIVE PERFORMANCE RATING FORMULA EMLOYEE classification formula.

247.     I explained both how the scoring criteria was deliberately misapplied by Plaintiff Manager Michael Glendenning and HR Rep Patrick Tarry to undervalue Plaintiff goals and create a substandard rating outcome but also how false CLASSIFICATION inputs were fed into the NINE BOX QUALITATIVE PERFORMANCE RATING FORMULAFORMULA by Plaintiff Manager Michael Glendenning and HR Rep Patrick Tarry for the purpose of manipulating the function output so that the function output could be used as a basis for a fraudulent and defamatory classification. This classification was a direct product of fraud and manipulation.

248.     On May 6, 2024 Plaintiff filed an amended complaint with the EEOC regarding the federal violations in the April 23, 2024 Performance Review as well as the fraudulent classification inputs for the NINE BOX EMPLOYEE CLASSIFICATION FORMULA.

249.     On June 13, 2024 I was called into a room with Plaintiff Manager Michael Glendenning and Amanda Stevens who introduced herself as HR Rep Patrick Tarry's boss and informed me that she would be in charge of handling Plaintiff Manager Michael Glendenning's charges against me going forward.

250.     Michael Glendening then stood up and handed me a disciplinary document entitled "Performance Improvement Plan" which stipulates: Starting 6-13-2024 a disciplinary probation sanction of 90 days will be imposed upon me wherein I am required to meet with

35

Plaintiff Manager Michael Glendenning every two weeks during which time he will determine whether I have violated any company rules, policy or procedure.

251. If for any reason Plaintiff Manager Michael Glendenning gives Amanda Stevens a Summary Report alleging, I have done anything which he feels violates the above I will be terminated.

252. The Factual Predicate used for the initiation of these proceedings stated: On October 30, 2023 I sent a status update to Tractor Supply and Toshiba Management. According to Plaintiff Manager Michael Glendenning Tractor Supply "said the email was unprofessional." However, this is contradicted by the record.

253. On 11-29-2024 charges me with disrespecting and attempting to intimidate Pranav Patel when I asked him to produce an email that he said he sent me which I contended, and still contend did not exist.

254. Lastly, Plaintiff Manager Michael Glendenning maintains that on February 29, 2024 I stopped by a meeting he was holding and was "disrespectful, unprofessional, disruptive, and that Plaintiff challenged Glendenning on who should participate".

255. Not one of these three situations justify Plaintiff Manager Michael Glendenning placing me on disciplinary probation.

256. First, it is unprecedented for an employee to be placed upon disciplinary probation in June for something alleged four months prior in February.

257. Second, contrary to Michael's allegation I never became disruptive or challenging toward him during the February 29, 2024 encounter. This was a false and defamatory statement by Glendening solely intended to disparage my reputation in the workplace both socially and professionally.

36

258. Third, it is unprecedented for an employee to be placed upon disciplinary probation in June for something alleged seven months prior in November.

259. Fourth, contrary to Michael's allegation I never became disrespectful or intimidating to Pranav.

260. Fifth, it is unprecedented for an employee to be placed on disciplinary probation in June for something alleged eight months prior in October.

261. Defendants contend that disciplinary probation was initiated on June 13, 2024 for a rating of 2.83 that Complainant was given on his performance in on April 6, 2024.

262. The fact that the Respondents decided two months later to initiate disciplinary probation proceedings against Complainant is pretextual.

263. Complainant contends that if Respondents genuinely initiated the disciplinary proceeding against him based upon the rating Plaintiff Manager Michael Glendenning gave him on April 6, 2024 then the disciplinary probation would have been commenced in April as well.

264. The only intervening event between the April 6, Performance review and the June 13 disciplinary probation commencement was the Complainant's May 6 filing of the Amended Complaint with the EEOC.

265. Thus, the Complainant's filing of the Amended Complaint is the only chronological catalyst within proximity of the June 13 disciplinary probation commencement.

266. Therefore, the proximity represents the causal nexus between the May 6 Amended Complaint and the June 13 disciplinary adverse action as there was no other intervening event which could have been the catalyst.

267. Furthermore, both the FY23 Mid Year Review and the FY23 Year End Review were both constitutionally unlawful and so therefore could have never been used as the

37

basis for the June 13, 2024 disciplinary probation in any event. Such would have constituted "the fruit of a poisonous tree." This is true in the same sense that an invasive surgery cannot be predicated on and justified by an incorrect diagnosis. Using an unlawful act as a rational basis to justify a subsequent unlawful act is purely circular logic as an unlawful act can never produce a subsequent lawful act.

268.    Lastly, Respondents have made admissions in their May 23, 2024 Position Statement wherein they reveal Plaintiff Manager Michael Glendenning and HR Rep Patrick Tarry covertly created data inputs according to a criteria never previously revealed or discussed with him that produced an output using the NINE BOX QUALITATIVE PERFORMANCE RATING FORMULAFORMULA to classify the Complainant as a "low performer/low potential" "Detractor". This Classification and the assertions underlying it are completely defamatory, fraudulent, targeting, selective and retaliatory in nature purely contrived to produce verifiably false business records to facilitate cover up and obstruct the federal investigation. And the fact that the Respondents created and relied upon verifiably false assertions which they knew to be false reflects malice and corrupt intent.

269.    These newly discovered facts individually and cumulatively reflect the continuing conspiracy to retaliate against the Complainant by means of defamation and fraud and to undermine and obstruct the Federal Investigation.

270.    On 12-27-2019 I had been working on assignment in the receiving area studying and assessing workflow protocols and areas for improvement in these operations process as directed when a non-covered employee named Jordan Slaughter in a fit of anger sped towards me with his fists balled and got in Plaintiff face until he and I were chest to

38

chest and started yelling and screaming in Plaintiff face in a very loud and aggressive manner to which I did not respond either physically or verbally.

271. During this entire time the Team Lead Philip Sargent (also non covered employee) was physically present and never attempted to verbally intervene by ordering Jordan to stop advancing towards me in an aggressive manner with his fists.

272. Nor did the Team Lead attempt to physically separate Jordan Slaughter when he was chest to chest with me staring me down and angrily shouting in Plaintiff face still with his fists.

273. Nor did the Team Lead Philip Sargent verbally warn or admonish Jordan Slaughter after the fact.

274. I felt very threatened, intimidated, and unsafe in this situation. I also felt unprotected by Philip Sargent and a loss of confidence in his willingness to enforce Toshiba so called "zero tolerance" policy for violent or aggressive conduct and assure a safe working environment.

275. I reported this incident the following business day Monday morning on 12-30-2019 both verbally and in writing. I formally requested Plaintiff Manager Michael Glendenning who was Jordan's manager to make the video footage from the security camera which surveils receiving available for me to review as evidence and Jordan's conduct towards me.

276. Nor did Plaintiff Manager Michael Glendenning call me into his office to host a meeting and discussion with Jordan about his aggression. (like he famously claims he was doing with me and Pranav). To the contrary, Michael did nothing.

39

277. I then filed a criminal complaint regarding and Jordan Slaughter was charged with a violent misdemeanor for his intimidating and threatening conduct.

278. When Plaintiff Manager Michael Glendenning found out he approached me and was visibly agitated and said: "Did Greg tell you to do that?"

279. Greg subsequently communicated to me that dropping the charges against Jordan Slaughter was a "pre-condition" of Plaintiff continued employment with Toshiba. Greg further expressed that HR was aware and supportive of this arrangement.

280. <u>DISCRIMINATORY PLAIGERISM AND PERFORMANCE CONCEALMENT</u>

281. In December of 2022, I conducted an independent Root Cause Analysis of historical data regarding unjustified overnight shipping charges to the company.

282. When I shared this information with Plaintiff Manager Plaintiff Manager Michael Glendenning he smiled and stated: "you identified an important process gap that has substantial financial impact for the company".

283. I called a meeting to implement a system based Quality Control solution which was rejected.

284. Plaintiff Manager Plaintiff Manager Michael Glendenning approached me off the record and informed me that he had personally discussed the waste with the Services Director and that he expressed great interest in learning more and being involved in the solutioning of the problem.

285. Plaintiff Manager Plaintiff Manager Michael Glendenning directed me to share Plaintiff empirical evidentiary findings with Director Chris Limley which I did.

286. After I shared this research Plaintiff Manager Michael Glendenning then took the research, had the dollar benefit quantified to a valuation of $800, 000 in hard cost savings and took over the initiative, renamed it, filed it with the Executive Steering Committe under

40

his name as a continuous improvement project for which he and several of his peers would be credited, disassociated me from any further involvement in the initiative and never credited or mentioned Plaintiff research and analysis in Plaintiff Performance Review.

287. This was a fraudulent plagiarism of Plaintiff idea, research, analysis, findings and work product and was discriminatory disparate treatment in that he does not treat non black employees in the same way.

288. In early October 2023 Plaintiff Manager Plaintiff Manager Michael Glendenning told me that he needed a way to boost and incentivize repair productivity without increasing the budget.

289. On October 13, 2023 Plaintiff shared idea and method with Plaintiff Manager Plaintiff Manager Michael Glendenning "to boost and incentivize productivity through earn a one hour coupon that they can cash in        for Time off for every 3 or 4 repairs above quota. They can accumulate up to 8 coupons which they can cash in for time off either individually or in any combination up to 8 totaling one full day. However, they would still have to schedule when they want to use those coupons with their Manager. I've done the math and the ROI benefit exceeds the time off the company would be giving. There would be several levels of benefits coming out of such program."

290. Plaintiff Manager Plaintiff Manager Michael Glendenning then took the solution Plaintiff shared with him and delegated  the  project  to  one  of  his  non  covered subordinates.

41

291. Plaintiff Manager Michael Glendenning took full credit for the solution and gave performance credit to his non covered subordinate and never shared any acknowledgement, appreciation or performance credit with Plaintiff.

292. Nor did Plaintiff Manager Michael Glendenning include such solution in Plaintiff's "Pay For Performance" program review.

293. In April 2023 Plaintiff was requested to provide a process map and solution to ensure that one of our Customers, Dollar General, was having their replenishment inventory properly processed and credited at the end of each billing cycle because process gaps and breakdowns in the Dollar General inventory management and reconciliation workflow had given Executive Director Mark Johnson cause for concern that TOSHIBA GLOBAL COMMERCE SOLUTIONS created legal and financial liability "exposure".

294. In direct response to this business request and business risk Plaintiff created a reconciliation report which Plaintiff named "Dollar General Credit Application" receipt.

295. Plaintiff Manager Plaintiff Manager Michael Glendenning being informed interfered in the performance of Plaintiff duties in an effort to a) discriminatorily exclude me from the Dollar General inventory management, reconciliation and credit application process which was one of Plaintiff roles and responsibilities and for which Plaintiff had created the Dollar General TCX800 workflow process which was implemented by TOSHIBA and b) fraudulently conceal the process gaps which Plaintiff informed him about and which he was knowledgeable of by stating by expressing that the risk was already resolved six months ago by a solution he would not identify.

296. Dollar General subsequently filed civil action to which TOSHIBA GLOBAL COMMERCE SOLUTIONS agreed to a 3.5 million settlement.

42

297.     Glendenning discriminatory subversion, obstruction and interference in Plaintiff terms, conditions, role, scope of his responsibilities not only caused such legal exposure but facilitated in the continuation of such incompetence, negligence and malfeasance over a period of several years unchecked.

298.     Plaintiff manager Plaintiff Manager Michael Glendenning discriminatory and disparate exclusion of Plaintiff solution and efforts to fulfill the business request given to me was, in part, intended to conceal and facilitate the process gaps he knew existed and thereby contributed to such liability exposure. Discriminating against an employee for an unlawful purpose is still unlawful.

299.     On November 29, 2023 Plaintiff's Manager Michael Glendenning engaged in conduct to target, harass, intimidate, discriminate, defame and retaliate against Plaintiff for his EEOC complaint by orchestrating a confrontation when he called Plaintiff into his office where he, Bob Hunsinger and Pranav Patel were all waiting for Plaintiff.

300.     Plaintiff's Manager Michael Glendenning then went on to assert that Plaintiff was in violation for copying his coworkers on email and that he was prohibiting him going forward from being able to communicate with any coworkers outside of the department about operational issues which impacted the customer regardless of whether it impacted other team members outside the department or not.

301.     Plaintiff was acting within the scope of his duties at all times and no such prohibition was ever placed on white non covered employees.

302.     Plaintiff had violated no rules, ethics, policies or procedures. Furthermore, Glendenning knew that his admonishments would have intimidating and psychological impact because he had recently written Plaintiff up on false disciplinary charges one month prior.

43

303. Plaintiff had been written up on September for a Final warning by Glendenning without having violated any disciplinary rule.

304. A Final warning means an employee will be terminated from their employment if there is a subsequent write up.

305. Glendenning orchestrated this confrontation with Plaintiff as a means of psychological warfare under circumstances where he knew he had manipulated an administrative organizational advantage to put Plaintiff under undue duress when he was acting within his job and had violated no corporate rule, ethics, policy or procedure.

306. Glendenning behavior was embarrassing, frustrating, intimidating, demeaning and hostile.

307. Plaintiff emailed a detailed complaint to Patrick Tarry but was ignored.

308. Patrick Tarry later told Plaintiff in Glendening's presence that he did receive and did recall the complaint but that he was not getting involved in that.

309. Such conduct was not normal management practice. Other white non covered employees are communicated with one on one behind closed doors.

310. When Plaintiff entered Glendenning began complaining that he did not approve of Plaintiff copying cross functional team members on emails and making them aware that there were operational issues with Sams Club RMA management.

311. This confrontation was staged by Plaintiff's Manager Michael Glendenning who knew Pranav Patel harbored animus toward Plaintiff for identifying and questioning Pranav failure to follow process which Plaintiff created and trained him to do.

312. Plaintiff's Manager Glendenning knew that if he lured Plaintiff into a secluded environment with only his most loyal subordinates present who possessed animus

44

towards Plaintiff and began making accusations against Plaintiff it would put Plaintiff on the defensive.

313. Glendenning then used this scenario to imply to Pranav Patel and Bob Hunsinger that he was on their side and that Plaintiff was the antagonist in the room.

314. When Pranav became hostile and evasive in response to being requested to produce an email reflecting notification of why he was not processing the 87 Sams Club guns Glendenning accused Plaintiff of bullying Pranav. This was false and contrived.

315. At no time during the meeting was Plaintiff hostile, bullying or otherwise offensive to Pranav.

316. Defendants knowingly entered into a tacit agreement the object of which was to create and promote verifiably false material statements and concealment in matters withing U.S. Jurisdiction with the intent to (a) mislead b) harm c) falsify, d) conceal, and e) cover up by any trick, f) scheme, and g) device a material fact and then acted in the furtherance of such conspiracy by falsifying statements and business records for the purpose of misleading and obstructing the EEOC investigation in an effort to conceal and cover up the discrimination, retaliation, defamation and fraud committed against Plaintiff.

317. Between January 2023 and September 2024 Plaintiff's Manager Michael Glendenning made a series of serious defamatory comments in writing intended to portray Plaintiff in a negative light to others in the workplace based on verifiably false statements which Plaintiff's Manager Michael Glendenning knew to be false.

318. On January 9, 2023 Glendenning accused Plaintiff of creating a "hostile work environment" and "attacking" a staff member who Plaintiff, in fact, did not send the email to and who was not on copy.

45

319. In the first instance, it is verifiably false that Plaintiff was being "hostile" to a coworker in his email as the subject employee was neither the intended recipient of the email nor privy to Plaintiff objective CLASSIFICATION which only expressed a concern for best practices, the employees repeated deviation therefrom and concern for the customer owned inventory solely to management.

320. Thus, Glendenning knew my communication was not embarrassing the employee, or "attack" the employee.

321. Nor was Plaintiff objective CLASSIFICATION creating a hostile work environment for the employee. The employee was not privy to Plaintiff's CLASSIFICATION.

322. On September 12, 2023 made the following defamatory statement in writing that Plaintiff violated company policy by including executive management in email "for no reason."

323. It is both Corporate "*Custom*" and "*Common Practice*" to keep Senior Leadership abreast of important topics by including them on copy. As such, this is the only "reason" Plaintiff needs. No other reason is required.

324. The issue in the email pertained to a) a new Customer b) a large financial contract c) an account which had been designated a "Strategic Account" by sales division d) a business requirement not previously included in the planning requirements e) a requirement which had been brought to Plaintiffs attention within just the past 24 hours f) a requirement which Plaintiff was being afforded an unreasonably short deadline to achieve (i.e., convert several sets of previously established automated reports to all be modified to include Customers part number for all transacted items) g) a requirement that Plaintiff was told could adversely impact specific performance of agreed contractual "Go

46

Live" deadlines. The projected revenue from which had already been baked into next quarters financial projections.

325. Therefore, the nature and scope of the newly announced risk was neither trivial nor routine and plaintiff had good cause.

326. Glendenning allegation that Plaintiff had "no reason" to copy senior executive levels of our management in emails is both a Fraudulent misrepresentation of the facts and a Defamation against myself within the workplace.

327. On September 12, 2023 Glendenning made the following defamatory statement in writing that Plaintiff violated company policy by repeatedly violating written escalation process.

328. First, the allegation that a formal escalation process exists is a false statement in itself. There is no policy, procedure or notice referencing escalation or under what circumstances.

329. Nor should Glendenning have disparaged Plaintiff in writing of violating a policy that does not actually exist.

330. Additionally, the deliberate failure to include the material facts constituted the deliberate suppression of exonerating and mitigating facts.

331. Furthermore, **False:** Plaintiff reported risk in good faith pursuant to Toshiba Standards of Conduct as obligated by the Board of Directors. The Board of Directors made no such stipulation. To the contrary, The Board of Directors explicitly stated an employee had the option of bypassing middle management if the report was being made in good faith.

332. On September 12, 2023 Glendenning made the following defamatory statement in writing that Plaintiff escalated him to the CEO Rance Pohler.

47

333. Plaintiff's communication was not an escalation. An escalation is a communication where 1) the communication is addressed directly to the Superior employee. Plaintiff's communication was not addressed to Rance. Plaintiff's communication was addressed to Glendenning.

334. Second, an escalation is one where a complaint is being made about a failure to act or resolve at the lower level. Plaintiff never made any complaint or allegation in my communication that you had failed to act or resolve.

335. Third, the final key element of an escalation is that the party escalating makes a request to the higher authority for some form of intervention and resolution to an open issue. Plaintiff never made any such request of the CEO.

336. On September 12, 2023 Glendenning made the following defamatory statement in writing that Plaintiff September 1, communication responding to Rebecca Miller with Rance on copy violated a directive given to me by Patrick Tarry on August 29th, 2023.

337. Patrick never told me I was prohibited from keeping Rance abreast of a situation if it fell within the criteria expressly set forth by the **Board of Directors** regarding **a)** risk and **b)** good faith of which my September 1, 2023 communication met both criteria. Therefore, your allegation that my September 1, 2023 communication where I copied Rance violated a directive given to me by Patrick Tarry is both a Fraudulent misrepresentation of the facts and a Defamation against myself within the workplace.

338. On September 12, 2023 Glendenning made the following defamatory statement in writing that Plaintiff September 1, 2023 email to Rebecca Miller violated Steve Mensch August 25th communication about using management chain.

339. My September 1, 2023 communication was expressly authorized in writing and obligated by the Board of Directors in Toshiba Standards of Conduct protocol, and

48

Plaintiff was, therefore, acting within the scope of my duties as Plaintiff understood them to be. Therefore, your allegation that my September 1, 2023 communication where Plaintiff copied Rance violated a directive given to me by Steve Mensch is both a Fraudulent misrepresentation of the facts and a Defamation against myself within the workplace.

340.    On September 12, 2023 Glendenning made the following defamatory statement in writing that "when Steve Mensh asked why Plaintiff copied Rance on my September 1, 2023 email Plaintiff "gave no clear reason".

341.    This was a deliberate falsehood. Plaintiff, in fact, gave a very clear reason that met both criteria **a**) and **b**) of the Board of Directors requirement. And Steve Mensch responded: "*I get that*" (indicating not only his understanding of Plaintiff's reason but also his agreement with Plaintiff's reason). Therefore, Glendenning allegation that when Steve Mensch asked why he copied Rance on my September 1, 2023 communication Plaintiff "gave no clear reason" is both a Fraudulent misrepresentation of the facts and a Defamation against myself within the workplace.

342.    On September 12, 2023 Glendenning made the following defamatory statement in writing that Plaintiff "repeatedly failed on numerous occasions to follow our (i.e., corporate) guidelines".

343.    Glendenning omission to cite any written corporate guidelines was, in fact, an admission that there were no written corporate guidelines that Plaintiff had actually violated

344.    On December 12, 2023 During the 2023 Mid-Year Performance Review Plaintiff Manager Michael Glendenning made the defamatory statement: that Plaintiff between

49

April of 2023 and September 2023 Plaintiff had been "accusatory" toward his coworkers and therefore violated company policy and practice.

345. At no time did Glendenning state what he meant by "accusatory", when Plaintiff allegedly committed these acts, what the circumstances were or even, not did Glendenning disclose the identity of the individuals who were allegedly the victims or targets.

346. The reason why such broad and vague accusations were used by Glendenning is because they were false, and Glendenning knew they were false.

347. Nevertheless Glendenning used this disparaging comment as a device with which to justify the fraudulent devaluation of Plaintiff's Performance rating.

348. On December 12, 2023 During the 2023 Mid-Year Performance Review Plaintiff Manager Michael Glendenning made the defamatory statement: that Plaintiff between April of 2023 and September 2023 Plaintiff had "said something confusing to a customer on a call".

349. At no time then or after did Glendenning ever specify a) what exactly Plaintiff said that was confusing b) when this was allegedly said by Plaintiff c) the identity of the customer who was allegedly confused.

350. This defamatory comment was false and Glendenning knew it was false when he used it in Plaintiff's Mid-year 2023 Performance Review to disparage Plaintiff and fraudulently devalue Plaintiff's performance rating.

351. On March 22, 2024 James Fornabaio made **15** materially false written statements for the purpose of misleading and obstructing the EEOC investigation and covering up the continuing civil conspiracy against Plaintiff.

50

352. "Mr. Noble's Co-workers complained often about his bullying". This is a false statement as no Co-worker ever alleged that Plaintiff was a bully or that they had been bullied by Plaintiff. In fact, no staff member ever stated that Plaintiff ever made a false statement to or about anyone.

353. "Mr. Noble does not have people management responsibilities". Plaintiff is not a manager but Plaintiff has been formally entrusted with the training, development, assignment, directing and leading personnel in execution numerous times as well as taking the Lead on initiatives, projects and business planning calls.

354. "Accuses co-workers of nefarious or unethical activity which is unfounded". This is a blatantly false accusation. Plaintiff has never been charged with or disciplined for lying on a coworker. Nor is there any record of Plaintiff making any uncorroborated statement

355. "employees have expressed concern for their safety". This is a very dangerous and defamatory statement. Plaintiff has been employed with TOSHIBA since 2019 and has interacted with hundreds of personnel. No employee has ever articulated a belief that Plaintiff posed a threat or risk to their health or safety.

356. "Mr. Noble communicates with peer(s) in a condescending and demeaning tone". Again this is a false and disparaging statement. No employee has ever articulated an event where Plaintiff communicated with them in a condescending manner.

357. "often instructs them to do work which is outside the scope of his job". Again, this statement is purely false and defamatory as Plaintiff has never instructed personnel to do anything outside the scope of his duties. To the contrary, any assignment or direction communicated to staff was at the direction of Plaintiff's Superiors.

51

358. "accusatory and uncooperative behavior is also evident in email communications with Toshiba customers on copy." There does not exist any emails which reflect Plaintiff being either "accusatory" or "uncooperative" with customers on copy.

359. "Is the source of at least one customer complaint". Plaintiff contends that although this was alleged there is no record of a customer complaint actually being filed or produced which Plaintiff repeatedly requested. The fact that such filing should otherwise exist per policy and procedure but does not infers that it never occurred.

360. Plaintiff further contends that, in any event, TOSHIBA adverse action was discriminatory and disparate in that it was selective and used to undervalue Plaintiff rating in a way that is disparate, unprecedented and more severe than similarly situated non covered Caucasian employees that have actually caused service failures or repetitive customer complaints.

361. Even if a customer complaint did exist, which Plaintiff contends it does not, no employee has ever been downgraded in their performance rating for their first customer complaint in the history of their employment in four years where no actual SLA service delivery failure actually occurred. Plaintiff further contends that his email was factually correct, respectful, informative and in line with all current communication project updates being provided to the customer during such project check points and interactions during which similarly situated non covered employees were permitted to identify operational issues related to customer delay.

362. "Mr. Noble received targeted support and coaching on specific performance deficiencies, through regularly scheduled 1-on-1 meetings. Plaintiff's bi-weekly 1-on-1 meetings were canceled by his Manager for the entire year of fiscal 2023 in disparate violation of corporate policy and practice.

52

363. "The delay from October 27, 2023 through to December 12, 2023 was required to validate the performance appraisal" (of Mr. Noble). This is false.

364. First, no evidentiary basis was provided for why, out of all Glendenning direct reports it would have taken over a month and a half beyond the corporate deadline to validate his performance appraisal especially given the fact that this notice was given to all Managers several months in advance.

365. Second, James Fornabaio's excuse is belied by Glendenning own written admission that the review had been completed and submitted by him prior to the corporate deadline and was delayed by Patrick Tarry to "determine if uncompleted goals would carry over to next review period".

366. Glendening excuse is also verifiably false because Patrick Tarry had already stated in writing a year earlier that uncompleted goals would be carried over to next review period. And so there was no need to delay Plaintiff Performance Review for a month and a half beyond the corporate deadline to make a procedural determination that had in fact already been made in writing over a year ago.

367. The more logical and fact-based reason for the delay is because defendants were trying to run out the clock on the EEOC investigation so that the EEOC would not be aware that defendants intended to improperly utilize events outside of Plaintiff's review period (April through September of 2023) as a factual predicate to devalue his 2023 Mid-Year Performance review (the events of October 2023) which was disparate by definition on all levels, policy wise, common practice wise, fairness wise, integrity wise and retaliatory.

368. This was also procedurally fraudulent because you can't use subsequent events that allegedly occurred after the review period (Octoberer 2023) to serve as a factual basis for a devaluation during the review period (April through September 2023) and is proof of

53

contrivance and defendants' intent to incorporate unlawful gamesmanship into the process to prejudice Plaintiff so they could later use the "Two Consecutive" low performance rating rule as a pretext to place Plaintiff on a PIP and prejudice his employment record.

369. Mr. Glendenning used those words with all his direct reports " you have to walk on water" (referring to Jesus Christ). This is false. Corporate policy expressly dictates performance standards have to br both practical, achievable and realistic. The standard applied by Glendenning against Plaintiff was none of these. This is further proof of predetermination to set plaintiff up for failure.

370. Mr. Noble was not held to a higher standard than any white peer. False. (They were reviewed based their performance from April 1st to September 30...Plaintiff was punished for allegations from October 30 and November 29 far outside of the corporate mid-year performance review period)

371. Performance appraisal was justified due to unacceptable conduct. False.

372. All of Mr. Glendenning reports were held to the same standard. False. None of the other direct reports were subjected to the same standard or contrivance.

373. "All claims raised by Mr. Noble to HR and Senior Management underwent thorough review and investigation. False. There is no record of any such investigation. Plaintiff requested it repeatedly during EEOC investigation and in rebuttals and Defendants failed to produce. Their omission is evidence that it does not exist because no investigation ever occurred and further serves as the basis for Supervisory liability based on failure to investigate.

374. On May 23, 2024 James James Fornabaio again made **22** additional materially false, fraudulent and defamatory written statements for the purpose of misleading and obstructing the EEOC investigation and covering up the continuing civil conspiracy against Plaintiff.

54

375. "Mr. Noble demonstrated a pattern of confrontational and bullying conduct."

376. "Mr. Noble created a negative and toxic work environment."

377. "Mr. Noble was disruptive to the workplace".

378. "Mr. Noble performance rating was based on an appropriate valuation"

379. "Mr. Noble accusatory, confrontational and bullying behavior precluded possibility of receiving a higher rating on any of his goals"

380. "Noble interrogates personnel"

381. "There was a Customer complaint filed"

382. "Mr. Noble accused the customer of doing something wrong"

383. "The customer stated Noble email was unprofessional"

384. "The customer stated within the complaint filed that Noble email was an example of Toshiba not putting their best foot forward".

385. "There is no evidence that Mr. Glendenning falsified records".

386. "Mr. Noble was appropriately given a performance rating of 2.8"

387. "The NINE BOX QUALITATIVE PERFORMANCE RATING FORMULA CLASSIFICATION tool reflects performance and potential".

388. "Mr. Noble does not positively contribute to an inclusive work environment."

389. "Mr. Noble causes employees to not feel valued for their differences or empowered to participate and contribute freely."

390. "Mr. Noble makes personnel feel unsafe."

391. "Mr. Noble's colleagues do not wish to work with him".

392. "Mr. Noble does not effectively and appropriately interact with others to build relationships".

393. "Mr. Noble does not possess an open and approachable demeanor."

55

394. "Mr. Noble does not demonstrate change readiness and resilience".

395. "Mr. Noble does not use critical thinking to evaluate problems."

396. "Mr. Noble fails to objectively gather information with an open mind and objectively analyze and evaluate the problem to form a decision."

397. On August 22, 2024 James Fornabaio again made 17 additional materially false written statements for the purpose of misleading and obstructing the EEOC investigation and covering up the continuing civil conspiracy against Plaintiff.

398. "Noble engaged in bullying behavior throughout the fiscal year."

399. "Several employees reported having been bullied by Noble."

400. "Several employees reported Noble made accusations against them".

401. "Four employees requested not to work with Noble at all."

402. "One customer complained about Noble unprofessional communication style."

403. "The PIP was not based on the three specific incidents."

404. "Noble undermined customer trust".

405. "Noble behavior was detrimental to the workplace".

406. "Noble accused a coworker and Manager of stealing his Intellectual Property".

407. "Noble accused a coworker of fraudulent conduct wrongly assuming a service ticket had been closed without resolution."

408. "Noble accused a coworker of falsifying labor cost."

409. "Noble failed to follow management instructions".

410. "Noble caused confusion of a customer".

411. "Noble was demeaning, rude and accusatory during a meeting with a coworker in November 2023".

56

412. "Noble interrupted a meeting he was not invited to, questioning his manager about who should be in attendance."

413. "Noble allegation that Mr. Glendenning and Mr. Tarry knowingly relied on false information to assign him the "Detractor" classification is baseless".

414. "The low potential score is due to his failure to demonstrate the core competencies essential for all employees."

415. On June 13, 2024 Plaintiff Manager Michael Glendenning made 7 additional materially false, fraudulent and defamatory written statements for the purpose of misleading and obstructing the EEOC investigation and covering up the continuing civil conspiracy against Plaintiff.

416. "During FY 2023 you were bullying others"

417. "Noble created a hostile work environment"

418. "Your often accusatory manner often puts people on the defensive".

419. "February 29, 2024 I stopped by a meeting he was holding and was "disrespectful, unprofessional, disruptive, and that Plaintiff challenged Glendenning on who should participate"."

420. Furthermore, James Fornabaio stated Plaintiff was rated and punished based upon his submissions which included numerous statements containing accusations which had never been disclosed, discussed or referenced either in Plaintiff's review, never contained in any findings of fact, never disclosed in any accusatory instrument or mentioned in any communication.

421. James Fornabaio actions are an admission of disparate treatment as no Caucasian employee has ever been rated or punished based on statements never made known to them.

57

422. Further, in a concerted effort to deceive and mislead the federal investigation, James Fornabaio proceeded to submit a series of false written statements which had never been vetted, verified or corroborated that he had secretly placed in Plaintiff personnel file without Plaintiff knowledge in furtherance of the continuing civil conspiracy.

423. Each false statement contained within it an admission that the author of the statement was both an a) interested witness and b) harbored unjustified animus toward the Plaintiff.

424. Bob Hunsinger authored two false reports. The first false report alleged that Plaintiff accused TOSHIBA of corporate espionage and made conclusory assumptions about another employee.

425. On August 31, 2022 Bob Hunsinger provided a written statement to HR alleging that Plaintiff accused the company of corporate espionage.

426. This was a false statement. However, this statement was placed in Plaintiff's file by Patrick Tarry and kept a secret and used by Michael Glendenning in April 2023 during Glendenning FY 2022 Year End Review for Plaintiff. This was the first time this false statement was revealed to Plaintiff.

427. Bob Hunsinger knew this statement was both false and defamatory and falsified this business record to disparage Plaintiff and harm him in his employment.

428. Michael Glendenning relied on this false statement to devalue Plaintiffs Performance Review.

429. Bob Hunsinger also sent a communication to Steven Mensch in November 2023 accusing Plaintiff of calling Michael Glendenning a "Nigger" and pushing him in the chest and making threats. This was a false and defamatory statement.

58

430. The notion that Plaintiff would have been permitted to make a racial slur against a senior Manager and push another Manager in the chest is contradicted by common knowledge of Toshiba disciplinary policy as well as forceful disciplinary actions taken against Plaintiff in based on much less actions like asking a question in an email or simply copying the CEO on an email.

431. The authors of three of these false written statements were and are direct subordinates of Plaintiff's Manager Plaintiff Manager Michael Glendenning who is one of the principal conspirators in the continuing civil conspiracy and Plaintiff alleges were acting under his direction and in the furtherance of his unlawful interests and in the interest of currying his favor.

432. On July 9, 2024, during a meeting between Senior HR Manager Amanda Stevens and Senior Operations Manager Plaintiff Manager Michael Glendenning Plaintiff asked Stevens if new unscheduled business objectives came up because of new client needs and needed to be prioritized above and in front of previously pre-planned listed Goals and needed to be pushed back would Plaintiff be penalized to which Stevens replied "No".

433. During this same discussion Plaintiff then asked would the employee be entitled to receive credit in their rating review for the new, unscheduled business priorities that needed to be achieved during that period in it's place to which Stevens replied "Yes".

434. However, during Plaintiff's 2024 Mid-Year Review conducted Plaintiff Manager Michael Glendenning did not give Plaintiff credit for the new Walgreens priorities he was given and did achieve...in place of the Fifth Goal. Instead, Plaintiff's Manager only rated Plaintiff on Four out of Five Goals which lowered Plaintiff's rating to a 3.4.

435. Plaintiff's Manager Plaintiff Manager Michael Glendenning knew that if he gave Plaintiff credit for the Walgreens priorities in place of the postponed Fifth Goal it would

59

have raised plaintiff's overall performance rating above a "4" according to the formal company performance rating rubric. And so to prevent Plaintiff from achieving the higher rating he simply omitted the rating, subtracted the Fifth Goal and never afforded Plaintiff rating points "in place of" the Fifth Goal for the Walgreens priorities.

436. The intended effect was to devalue Plaintiff's legitimate performance rating by omitting credit for the Walgreens accomplishments for the Fifth Goal. This was adverse because Plaintiff's Manager knew bonus was based on Performance rating. The Performance rating is the foundation of the bonus and the bonus is a benefit.

437. This was a disparate act as Plaintiff's Manager was expressly informed by Senior HR Manager that the credit for any unscheduled priorities (such as the Walgreens requirements) achieved in place of and which took precedence over the previously approved goal should be credited to Plaintiff in the quantitative portion of the Performance Rating score calculation. Glendening circumvented this direction to deprive plaintiff of the higher score and higher bonus outcome it would have produced simply to discriminate and retaliate against Plaintiff through intentional subversive devaluation of his performance

438. Plaintiff was to be given credit for the unscheduled Walgreens priorities in place of the Fifth Goal but refused to afford Plaintiff that benefit. This was also part of the continuing civil conspiracy to violate Plaintiff's Civil Rights based on discrimination and retaliation to misrepresent Plaintiff as other than a high performing employee. And so Plaintiff's Manager deliberately failed to quantify the rating as expressly proscribed by the Senior HR Manager.

60

439. Plaintiff repeatedly contacted both Steven Mensch and HR Patrick Tarry providing them specifics in writing of this unlawful conduct and requesting them to conduct an investigation and each time they both indicated their acquiescence and complicity either by ignoring or retaliating against Plaintiff for seeking their support in addressing the unlawful conduct.

440. Their deliberate failure to investigate constitutes overt acts at the supervisory level taken in the furtherance of the facilitation of the continuing civil conspiracy to cover up the violation of Plaintiff's federal rights.

441. On July 9, 2024 Plaintiff participated in a formal meeting where my proposed goals for the year were being "Achieve formal Payment Card Industry Certification Data Security Standards "PCI Compliance is not a requirement for the business and customers we support.

442. Plaintiff responded that, contrary to Glendenning representation, as a storage and distribution facility of payment card devices, B level compliance approval was, in fact required, directly from the QSA.

443. Glendening's response to Plaintiff in the physical presence of HR Senior Manager Amanda Stevens was "Well...we don't need to do that".

444. Glendenning knew this statement was both false and misleading because Plaintiff had provided specific details of the industry requirements. Glendenning also knew that simply stating that the business complied with industry standards was not the same as being formally approved via PCI audit from a certified QSA.

445. Glendenning stated that it was on this basis that he was denying Plaintiff's proposed goal and was redirecting him change it to a different on HR rely on a fraudulent premise

61

for the denial of Plaintiff's proposed goal for formal training and implementation in this area.

446. On December 13, 2024 Glendening arranged for a PCI compliance audit for the very same purpose that he previously stated to Plaintiff and HR Management that it was not required.

447. To ensure that his false statements to Plaintiff and HR were not revealed, Glendenning attempted to conceal the existence of this audit, it's specifications, date and process requirements and planning from Plaintiff and instructed his direct subordinates to do the same so that Plaintiff a) would not be made aware of the falsehood and b) Plaintiff's discriminatory exclusion from the PCI compliance audit process.

448. The exclusion of the Plaintiff from this exercise was discriminatory as it falls squarely within Plaintiff Terms, Conditions, roles, responsibilities and scope as a required facility operations process and industry standard and non-covered employees were informed and invited to participate. There was no legitimate reason to deny plaintiff's goal, lie about the basis of the denial or conceal, circumvent and exclude Plaintiff from the PCI audit process. This was purely done to discriminate against Plaintiff on the basis of his race and to retaliate in the form of training exclusion for Plaintiff''s commencement and participation in the EEOC investigation which ended on September 20, 2024.

449. Glendenning's lie, denial of Plaintiff's goal and concealment of and exclusion from the PCI audit is evidence that his intention was to deliberately, mislead, redirect, exclude Plaintiff in a way that is disparate and retaliatory.

450. At all times defendants were cognizant of Plaintiff's racial profile and minority status as black American of mixed African and Native American heritage by virtue of numerous direct discussions, disclosures and cultural exchanges and interactions.

62

451. Upon information and belief, the defendants (with the exception of Scotte Enke) are still currently actively engaged in a continuing conspiracy to violate Plaintiff's federal rights.

452. **WHEREFORE**, Complainant contends that the above facts and circumstances constitute the basis of continuing conspiracy of Discrimination by means of Disparate treatment on the basis of Race, Retaliation, Fraudulent Misrepresentation, Fraudulent Concealment, Defamation and Obstruction by means of cover up and suppression of material evidence both individually and in their cumulative impact.

453. At all times relevant to this complaint, defendants conducted themselves (i) with evil motive, actual malice, deliberate oppression toward Plaintiff, (ii) with intent to injure Plaintiff's employment and civil rights, and/or willful disregard for Plaintiff's lawful rights and privileges.

454. COUNT I

455. TOSHIBA GLOBAL COMMERCE SOLUTIONS is liable to Plaintiff for race discrimination, harassment and disparate treatment based on race for acts alleged herein, including but not limited to stripping Plaintiff of his job responsibilities, failing to promote him to open Supervisory positions, reduction in merit pay, selective and fraudulent disciplinary weaponization, fraudulent performance devaluation and ratings, in violation of Title VII Civil Rights Act of 1964, and as Amended in 1991, N.C.G.S. Sec143-422.2 and 42 U.S.C. Sec 1981.

456. COUNT II

457. TOSHIBA GLOBAL COMMERCE SOLUTIONS is liable to Plaintiff for retaliating against Plaintiff for engaging in protected activity and for opposing practices made unlawful pursuant to Title VII Civil Rights Act of 1964, and as Amended in 1991.

63

458.	COUNT III

459.	Defendants James Fornabaio, Steven Mensch, Scott Enke, Amanda Stevens, Michael Glendenning and Patrick Tarry are liable to Plaintiff for defamation, fraud and conspiracy to cover up and obstruct the EEOC investigation after the fact.

460.	COUNT IV

461.	Defendants James Fornabaio, Steven Mensch, Scott Enke, Amanda Stevens, Michael Glendenning and Patrick Tarry are liable to Plaintiff for Supervisory Liabilty for Failure to Train, Failure to Enforce and Failure To Investigate unlawful conduct of subordinates.

462.	As a direct result thereof, Plaintiff contends that he has suffered pecuniary and non-pecuniary losses, including but not limited to, social, personal and professional humiliation, loss wages, loss benefits, future wages, professional injury in the terms, conditions, role, responsibilities and opportunities of his employment, mental anguish, emotional distress, physical sickness, social alienation, marginalization

463.	Certification and Closing

464.	Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary

64

support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

465. DAMAGES

466. Plaintiff seeks monetary compensatory punitive and exemplary damages in the amount of $300, 000 for TOSHIBA's discrimination.

467. Plaintiff seeks monetary compensatory punitive and exemplary damages in the amount of $400, 000 for TOSHIBA's retaliation.

468. Plaintiff seeks monetary compensatory punitive and exemplary damages in the amount of $500, 000 for Defendants continuing civil conspiracy of defamation, fraud and obstruction.

469. Plaintiff seeks monetary compensatory punitive and exemplary damages in the amount of $600, 000 for Defendant Steven Mensch, James Fornabaio and Scott Enke and Amanda Stevens Failure to Supervise, Failure To Train, Failure To Enforce and Failure To Investigate under Supervisory Liability.

470. Plaintiff seeks Declaratory Judgement.

471. Plaintiff seeks Injunctive Relief in the form of complete expungement of all falsified business records, records based upon falsified business records within Plaintiff's personnel file.

472. Restoration of all terms, conditions, benefits and opportunities.

473. Plaintiff seeks Injunctive Relief in the form of complete restoration of the Terms, Conditions, Roles, Responsibilities, Privileges and Benefits.

By attaching my signature I swear under penalty of perjury that all statements contained in

complaint are true.

_Casim Noble_ 12/18/2024
12/19/2024

Casim Noble
3116 Genlee Drive
Durham, NC 27704
Tel# 919-454-6935
cnoble1222@yahoo.com